**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER and RAY, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 10, 2014**

# In the Court of Appeals of Georgia

A13A1956. BHARADIA v. THE STATE.

RAY, Judge.

In 2003, a jury convicted Sandeep Bharadia of burglary, aggravated sodomy, and aggravated sexual battery. He was sentenced to life without parole for the aggravated sodomy offense and received concurrent 20-year sentences for the other two crimes. In an earlier appeal before this Court, we affirmed the trial court's denial of Bharadia's motion for a new trial. *Bharadia v. State*, 282 Ga. App. 556 (639 SE2d 545) (2006) ("*Bharadia I*").

In the instant case, Bharadia appeals from the trial court's denial of his extraordinary motion for a new trial. In a single enumeration of error, he argues that the court below erred in not finding that he met all six requirements for an extraordinary motion for new trial through what he contends is newly available DNA

identification evidence taken from gloves allegedly used during the crimes. For the reasons that follow, we affirm.

The following facts are relevant to the instant appeal. Bharadia and Sterling Flint were indicted together. Bharadia pled not guilty and proceeded to trial before a jury, while Flint negotiated a guilty plea and testified against Bharadia. Id. at 556. We adopt the statement of facts set forth in our prior opinion, as necessary, below.

> At trial, the victim testified that on Sunday, November 18, 2001, she returned from church to her apartment in the town of Thunderbolt. As she walked in the door, a man she did not know was standing inside the apartment. The man forced the victim to take off all her clothes, put a blindfold on her, tied her to a chair, moved her to a bed where he bound her wrists to the bedposts and her ankles to the footboard, threatened to kill her with a knife, placed his mouth on her vagina, inserted his fingers and a Q-tip cotton swab into her vagina, and masturbated until he ejaculated on her stomach. During the assault, the man told the victim that he had a partner outside, and at some point the victim thought she heard the man talking to someone in her living room. After the assault, the man left the victim's apartment, taking her computer, suitcase, camera, jewelry, and compact discs with him. The victim subsequently contacted her parents, who in turn contacted the police. Several days later, Savannah police found the items stolen from the victim's apartment, along with the knife and *gloves used by the attacker*, in a house. The owner of the house was Flint's girlfriend and she told police that Flint had brought the items to the house. Flint was subsequently

arrested, and he told the police that he had received all of the items from Bharadia. Police showed the victim a photographic lineup including a picture of Flint, but she could not positively identify Flint as her attacker. Police later showed the victim another photographic lineup including a picture of Bharadia, and she identified him as the man who had assaulted her. She testified at trial that she has no doubt Bharadia is the man who attacked her.

(Emphasis supplied.) Id. at 556-557.

The victim further testified that she saw Bharadia, whose face was uncovered, at close range while he forced her into a walk-in closet in her bedroom and made her remove her clothing. When he tied her to a chair with a telephone cord, he covered her face and threatened to kill her with a knife. She testified that when she tilted her head, she could still see him, and she described what he was wearing. She also testified that he spoke with a Middle Eastern accent, claimed to be with Al Qaeda, and talked at one point in a language she could not understand. She testified that she heard Bharadia speak to a second person and heard that person laugh, but never actually saw anyone else. She also testified that when her blindfold shifted, she could see that Bharadia was wearing "blue and white golf gloves." Bharadia offered an alibi defense, claiming that he was in Atlanta when the crimes were committed in Thunderbolt. Id. at 557.

3

Prior to trial, the Georgia Bureau of Investigation tested towels from the victim's home, but they did not show the presence of semen. The gloves that the victim mentioned at trial were not tested for DNA evidence until 2004, the year after the trial. The test showed only that the DNA did not match Bharadia's DNA. The test did not identify the donor of the DNA. In 2012, about eight years after the first DNA test, Bharadia filed an extraordinary motion for a new trial and also sought post-conviction DNA testing of the gloves. On April 18, 2012, the trial court granted Bharadia's motion for a comprehensive CODIS database search using the DNA profile created from the initial 2004 DNA test of the gloves. After the CODIS search, the Georgia Bureau of Investigation issued a report showing that the DNA on the gloves matched that of Flint, Bharadia's co-defendant.

However, the trial court denied Bharadia's extraordinary motion for a new trial, finding that he failed to satisfy the requirements of *Timberlake v. State*, 246 Ga. 488 (271 SE2d 792) (1980). *Timberlake* provides that:

> It is incumbent on a party who asks for a new trial on the ground of newly discovered evidence to satisfy the court: (1) that the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that he did not acquire it sooner; (3) that it is so material that it would probably produce a different verdict; (4) that it is not cumulative only; (5) that the affidavit of the witness himself should

be procured or its absence accounted for; and (6) that a new trial will not be granted if the only effect of the evidence will be to impeach the credit of a witness.

(Citations and punctuation omitted.) Id. at 491 (1).

In contrast to a motion for new trial made within 30 days of a judgment, an extraordinary motion for new trial "is not favored; consequently, a stricter rule is applied to an extraordinary motion for a new trial based on the ground of newly available evidence than to an ordinary motion on that ground." (Citation and punctuation omitted.) *Drane v. State*, 291 Ga. 298, 300-301 (2) (728 SE2d 679) (2012). We will not reverse a trial court's ruling on an extraordinary motion for new trial "unless it affirmatively appears that the [trial] court abused its discretion." (Citation and punctuation omitted.) Id. at 300 (2).

Although the trial court found that Bharadia had met the third through sixth prongs of the *Timberlake* test, it also found that he failed to satisfy the first two prongs. The trial court reasoned that because the gloves were available to the defense for testing at the time of trial, they were not "newly discovered" evidence and that trial counsel failed to exercise due diligence because he did not get the gloves tested.

5

1. In his sole enumeration, Bharadia contends that because he satisfied all six *Timberlake* factors, the trial court erred in not granting his extraordinary motion for a new trial.

Among other arguments, Bharadia contends that, although the gloves were available at trial, the DNA evidence on them must be considered as separate, newly discovered evidence revealed only by the 2012 CODIS test showing that the DNA belonged to Flint. He asserts that the delay in acquiring this evidence from CODIS did not result from a lack of due diligence.

"The statutes which control extraordinary motions for new trial based on newly discovered evidence require a defendant to act without delay in bringing such a motion. OCGA §§ 5-5-23 and 5-5-41." (Citation omitted.) *Drane*, supra at 304 (3) b). As stated in *Timberlake*, a defendant must show that he has been diligent in presenting his extraordinary motion for a new trial and that he did not fail to acquire the evidence sooner as a result of a lack of diligence. *Timberlake*, supra at 491 (1). Accord *Drane*, supra at 304 (3) (b).

Bharadia presents several arguments on this issue. The first is that "nothing in the record . . . shows that trial counsel knew that DNA testing of the gloves was even a possibility." Clearly, counsel in a criminal case should have been aware of the

6

possibility of testing evidentiary items for DNA. See generally *Garnto v. State*, 247 Ga. 22, 24 (273 SE2d 608) (1981) (finding a lack of diligence where defendant and his attorney knew or should have known about defendant's alleged memory loss, history of alcoholism, and alcohol consumption on the night in question). Bharadia also argues that his indigence hindered his ability to find counsel for the present appeal, and that the Georgia Innocence Project accepted his case shortly after his initial appeal was decided in 2006. He contends that because he did not get a court order until 2012, and neither he nor his counsel could get the DNA evidence tested via the CODIS database without that court order, there was no lack of diligence.

However, this argument begs the question; that is, why didn't Bharadia file a motion to conduct DNA testing on the gloves prior to trial? Had he done so, he certainly would have learned that his DNA was nowhere to be found thereon[1], and had he asked the trial court for a comparison against the CODIS database, he also would have learned that the DNA matched that of his co-defendant, Flint. Further, the gloves were tested for DNA evidence the year after the trial, in 2004, and the results showed that the DNA did not match Bharadia's. In 2005, according to Bharadia's

---

[1] Since Bharadia claims innocence and that he wasn't even there, then logic dictates that he would have known his DNA wasn't on the gloves.

motion for new trial, an expert with Forensic Science Associates recommended at an in-chambers conference that reference samples be taken from Flint to see if his DNA matched the unidentified male DNA on the gloves. However, Bharadia points us to no evidence in the record, nor do we find any, showing his efforts to obtain DNA testing targeted at identifying a specific individual through CODIS either before trial, or, as required by the first *Timberlake* factor, supra, after the trial – for example, after the first DNA test in 2004 put him on notice that his DNA was not on the gloves, or after his initial appeal was denied in 2006 and he had retained new counsel. The record only shows that he first sought CODIS testing in February 2012. See *Llewellyn v. State*, 252 Ga. 426, 428-429 (1), (2) (314 SE2d 227) (1984) (holding that post-trial delay in obtaining and presenting allegedly exculpatory deposition evidence equated to a lack of required diligence where the record showed no effort by defendant to obtain evidence during four-year period between trial and witness's deposition, and a further two-year delay following that deposition before he filed an extraordinary motion for new trial); *Boatright v. State*, 155 Ga. App. 109, 109 (270 SE2d 321) (1980) (diligence lacking where there was no showing of what efforts, if any, were made to obtain the evidence at issue).

In *Garnto*, supra, we examined a situation similar to that of the instant case regarding a defendant's diligence, or lack thereof, related to his allegations of newly discovered evidence. In *Garnto*, the defendant filed an extraordinary motion for new trial arguing that a doctor's affidavit obtained post-trial stating that defendant was suffering from a form of psychosis and was not criminally responsible at the time of his offense amounted to newly discovered evidence. *Garnto*, supra at 23. However, that same doctor had evaluated the defendant three years earlier and stated that defendant was competent to stand trial; the earlier report did not address the defendant's criminal responsibility at the time of the crime. Id. Our Supreme Court found that the defendant's

> acceptance of the doctor's [first] report, which was silent as to the defendant's criminal responsibility at the time of the offense, without inquiry or interview, shows that it was owing to lack of diligence that the doctor's opinion as to the defendant's criminal responsibility was not acquired sooner.

(Citation and footnote omitted.) Id. at 24.

Bharadia supports his argument that, because of his indigence and difficulty finding counsel, he did exercise ordinary diligence, by citing *Britten v. State*, 173 Ga. App. 840 (328 SE2d 556) (1985), but that case is physical precedent only. *Britten*

9

involved a putative father in a child abandonment case who was legally required to pay for his own blood test to assess paternity and who did not get tested until six years after pleading guilty. Id. at 840-841. However, in *Britten*, unlike in the instant case, the indigent defendant made some showing about his efforts to obtain money to pay for the post-trial blood test that he alleged was newly discovered evidence. Id. at 841-842 (2). Our appellate court in *Britten* also considered the fact that there was a change in the law finding it unconstitutional to require the putative father to pay for paternity blood testing, and a change in medical science between the time of the plea and the time of testing that resulted in more reliable test results. Id. at 842-843 (2). Bharadia makes no argument related to a change in the law or in science related to his case.

Bharadia has not shown that the delay in obtaining the evidence was not caused by a lack of due diligence, and such a showing is an essential requirement in an extraordinary motion for new trial. *Llewellyn*, supra.

2. Bharadia also contends, as to the first prong of the *Timberlake* test, that the trial court erred in determining that the gloves, which were available at trial, were not newly acquired evidence. Rather, he argues that the DNA itself, rather than the gloves on which the DNA resided, was the newly discovered evidence. However, we have

10

determined that Bharadia has failed to show that the delay in acquiring that DNA evidence was not owing to a want of due diligence. See id. "Failure to show *one requirement* [of the test] is sufficient to deny a motion for a new trial." (Citation omitted; emphasis supplied.) *Timberlake*, supra at 491 (1). Thus, "[w]e need not reach the issue of whether the trial court erred in the rationale it used to deny the [extraordinary] motion for new trial. We will affirm under the right for any reason rule so long as the ultimate judgment is correct." (Citation omitted.) *Foster v. State*, 318 Ga. App. 124, 128, n. 12 (733 SE2d 423) (2012).

3. Bharadia, as part of the same enumeration, also argues that because the trial court earlier determined that Bharadia's trial counsel was not ineffective, it cannot also render the later, inconsistent opinion that trial counsel failed to exercise due diligence in testing the gloves. In making this argument on appeal, Bharadia overlooks the fact that the test for ineffective assistance of counsel differs from the *Timberlake* due diligence test.

The trial court found that trial counsel's failure to seek DNA testing because of "problems with the investigation" amounted to trial strategy. The only problems with the investigation that trial counsel testified about at the motion for new trial hearing related to DNA evidence found on a Coke can, not the gloves. It is true that

11

"there is a strong presumption that trial counsel's performance is not deficient but falls within the wide range of reasonable trial strategy, in which unwise tactics do not amount to ineffective assistance of counsel." (Citation omitted.) *Williams v. State*, 319 Ga. App. 888, 892 (3) (739 SE2d 4) (2013). It is also true that "[a]bsent testimony explaining trial counsel's rationale for declining to present certain evidence, we presume that his decision was a strategic one." (Footnote omitted.) *Dukes v. State*, 285 Ga. App. 172, 175 (2) (645 SE2d 664) (2007). No such presumptions adhere to the *Timberlake* test, which requires that the defendant prove that he did not lack diligence in failing to acquire the evidence sooner. *Timberlake*, supra at 491 (1). Specifically,

> whether diligence used was ordinary, or less than ordinary, must be determined in each case by comparing the conduct under consideration with that of the ordinary man under similar circumstances. Ordinary diligence is affected by one's surroundings and attendant circumstances.

(Citation and punctuation omitted.) *Britten*, supra at 841(2). Given Bharadia's failure to have the gloves tested either before trial or to show what, if any, efforts he made to acquire the DNA evidence in the nine intervening years between trial and his motion seeking the CODIS test, we cannot say that the trial court abused its discretion in denying his extraordinary motion for a new trial.

*Judgment affirmed. Barnes, P. J., and Miller, J., concur.*

12